GOTHARD, Judge.
This suit is against a bank for wrongful dishonor of a check by the drawee bank. The plaintiff payee appeals judgment dismissing his claim on an exception of no cause of action.
On or about April 15,1988 the defendant, Lynn Paul Martin doing business as LPM Enterprises, issued two checks payable to Richard Knauf and drawn on the Bank of LaPlace. Knauf endorsed the two checks, “For Deposit Only” and “A/C 12216967,” and deposited them into his personal account at the First National Bank of Jefferson Parish. The Hibernia National Bank of New Orleans then stamped the back of the checks, “credit to the account of the named payee, Hibernia National Bank of New Orleans.” The Bank of LaPlace received them on or before April 18,1988 and dishonored them, stamping them, “endorsement missing.” When the checks were presented again, the Bank of LaPlace returned them marked “NSF”.
On September 7, 1988 Knauf filed suit against the Bank of LaPlace, alleging wrongful dishonor and seeking damages. The Bank filed a peremptory exception of no cause of action. After a hearing on August 10, 1989, the court ordered the plaintiff to amend his petition in order to *183 allege sufficient facts to set forth a valid cause of action against the Bank. After the supplemental and amending petition was filed, the Bank filed another exception of no cause of action which was granted on December 27, 1989, dismissing Knauf’s suit with prejudice.
The issue before this court is whether or not the petition failed to state a cause of action.
The supplemental and amending petition makes the following allegations:
9.
Defendant, BLP’s, actions in the handling of LPM’s account were not within ordinary and customary banking practices; BLP and LPM did not have an ordinary banking relationship. BLP permitted LPM to maintain a constant overdraft in his checking account, the daily overdraft generally exceeding $1,000,-000.00. BLP benefitted significantly from this relationship, as they were charging the LPM account with significant NSF fees daily. LPM was permitted to maintain an overdraft in his account as long as he “covered” the overdraft with certified checks the following day. See Exhibit “A” as attached.
10.
LPM had tried to conduct this type of operations with another bank prior to going to BLP, but was asked to leave the other bank because the other bank considered the activities of LPM to go beyond the scope of customary banking practices and questioned the activities of LPM.
11.
Ultimately, LPM was indicted and plead [sic] guilty to federal violations of law for which this account was used.
12.
On or about April 18, 1988, employees and/or officers of BLP determined to dishonor the checks because BLP claimed plaintiffs “endorsement” was missing.
13.
BLP, however, paid other checks in the month of April which contained the same or similar endorsements as the Knauf checks, numbers 1379 and 1875. See Exhibit “B” as attached.
14.
It is a common practice in the banking industry to endorse a check with “For Deposit Only” with the account number.
15.
It is also an ordinary and customary banking practice for a bank to supply its customers’ missing endorsement. The purpose of this provision is to facilitate the negotiation of these instruments.
16.
As long as the bank supplies the endorsement, the check can be negotiated through normal and customary banking channels. The Hibernia endorsement accomplished this.
17.
BLP policy went beyond the ordinary and customary banking practice by allowing LPM to write checks on an account that did not have proper funds and selectively determining which checks were to be paid. Check numbers 1379 and 1875 were selected not to be paid by means of the endorsement missing stamp. Other checks drawn on LPM’s account, endorsed in the same manner, were paid. This is further evidence of the peculiar banking relationship between BLP and LPM which allowed LPM to conduct his illegal activities.
18.
BLP, through the actions of its employees and/or officers deliberately rejected both properly endorsed checks number 1379 and number 1875, for the reason of, but not limited to, selective disbursal of monies deposited in LPM account for the improper benefit of BLP *184 in earning enormous fees and/or for the benefit of LPM and his scheme.
19.
The actions of employees and/or officers of the defendant, BLP, caused the untimely delays in processing and/or payment of both LPM accounts checks, number 1379 and 1875, totalling $150,-131.00.
20.
Had BLP had a proper and customary banking relationship with LPM, the checks would have been properly processed allowing Knauf to receive the funds represented by the checks when originally presented. Instead, the checks were reprocessed and returned NSF.
Knauf argues in brief that had the checks not been dishonored initially and if the Bank of LaPlace had had an ordinary relationship with its customer, Martin, then he would have received the funds represented by the checks.
At the outset we agree with Knauf that the checks were sufficiently endorsed with his First National Bank of Jefferson account number and should not have been dishonored on grounds of insufficient endorsement. As explained in Asian Intern. v. Merrill Lynch, Pierce, Etc., 435 So.2d 1058, 1061 (La.App. 1st Cir.1983):
Under La.R.S. 10:4-205(1), a depositary bank which has taken an item for collection may supply any endorsement of the customer which is necessary to title unless the item contains the words “payee’s endorsement required” or the like....
However, as argued by the bank, under the Louisiana statute regarding commercial paper, the duty of the bank runs to its customer, i.e., the depositor, rather than to the third party payee. LSA-R.S. 10:4-402 provides that, “A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item.” The Supreme Court stated in Shreveport Prod. Etc. v. Bank of Commerce, 405 So.2d 842, 846 (La.1981), that the duty to avoid a wrongful dishonor of a customer’s checks “cannot be enforced by the payee since the payor bank is only liable to the payee if it has certified the check or otherwise become liable on it....” (Emphasis supplied.) See also Carroll v. Twin City Pontiac Used Cars, Inc., 397 So.2d 42 (La.App. 2nd Cir.1981). As there is no allegation that the payor bank had made a specific promise to pay Martin’s checks to Knauf, R.S. 10:4-402 does not apply to his claim of wrongful dishonor.
The criteria for ruling upon an exception of no cause of action are set out succinctly in Robinson v. North American Royalties, Inc., 470 So.2d 112 (La.1985), as follows:
... In deciding an exception of no cause of action, the court accepts the facts alleged in the petition, without reference to any extraneous supporting or controverting evidence, and determines whether the law affords any relief to plaintiff if those facts are proved at trial.
In our judgment, the plaintiff’s allegations regarding the bank’s erroneous return of Knauf’s check and its selective payment of checks drawn by Martin are sufficient to make out a cause of action in tort against the bank.
LSA-R.S. 10:4-103 requires that a bank be responsible for “its own lack of good faith or failure to exercise ordinary care.” [1] Note 4 states:
*185 Under this Article banks come under the general obligations of the use of good faith and the exercise of ordinary care. “Good faith” is defined in this Act (Section 1-201(19)) as “honesty in fact in the conduct or transaction concerned.” The term “ordinary care” is not defined and is here used with its normal tort meaning and not in any special sense relating to bank collections.
In Carroll v. Twin City Pontiac Used Cars, Inc., supra, the court held that a bank was liable to a third party payee for breach of promise to honor a draft and unreasonable delay in holding a check before dishonoring it. The court cited LSA-R.S. 10:3-409[2] and stated, at 44:
The import of this statutory provision appears to be clear. Although the drawee on a draft is not liable on the instrument until it is accepted, this does not preclude liability on the part of the drawee to the holder arising apart from the instrument, i.e., in tort or upon some other basis because of the drawee’s representation that the instrument will be accepted. Furthermore, La.R.S.. 10:4-103 imposes upon banks a duty to exercise ordinary care in the handling of commercial paper and provides for damages in the event of the violation of that duty.
Finally, we note that Professor Hersber-gen, in Bank-customer relationship under Louisiana Commercial Laws, 36 La.L. Rev. 29, 34 (1975), stated that banks “remain under the general obligations of good faith and ordinary care” in determining which checks to pay and which ones to dishonor when faced with an overdraft.
Accordingly, for the reasons assigned above, the judgment appealed from is reversed and the case is remanded for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.

. (1) The effect of the provisions of this Chapter may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.
(2) Federal Reserve regulations and operating letters, clearing house rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled.
(3) Action or non-action approved by this Chapter or pursuant to Federal Reserve regulations or operating letters constitutes the exercise of ordinary care and, in the absence of special instructions, action or non-action consistent with clearing house rules and the like or with a *185 general banking usage not disapproved by this Chapter, prima facie constitutes the exercise of ordinary care.
(4) The specification or approval of certain procedures by this Chapter does not constitute disapproval of other procedures which may be reasonable under the circumstances.
(5) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.

. (1) A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.
(2) Nothing in this Section shall affect any liability in contract, tort or otherwise arising from any letter of credit or other obligation or representation which is not an acceptance.